## Case No. 13,788.

### TAYLOR v. The COMMONWEALTH.

[6 Chi. Leg. News, 334; 13 Am. Law Reg. (N. S.) 502; 20 Int. Rev. Rec. 64.]

District Court, E. D. Missouri. 1874.[1]

MARITIME LIENS — HOME AND FOREIGN PORTS — AUTHORITY OF MASTER TO BIND— REPAIRS—SUPPLIES.

1. While in foreign ports the presumption of a necessity for relying upon the credit of the vessel for repairs arises from the necessity of repairs to enable the vessel to prosecute the voyage; in home ports the presumption of a necessity for relying upon the credit of the vessel does not exist.

2. In a foreign port the master, as performing the duties of that officer, has authority to bind the vessel and her owners for the necessary expenses of the boat, but in the home port he has not that right.

3. While in a foreign port the necessary repairs are restricted to such as will enable the vessel to pursue her voyage with safety, the repairs in the home port, where they may be ordered by the owners, are not of necessity restricted within such narrow limits.

4. Those who in a home port furnish repairs and supplies, must show affirmatively, in order to have a lien on the vessel, that it was necessary to rely on the credit of the vessel; or, in other words, that the credit of the owners was not such as would justify a prudent man in furnishing the supplies and repairs solely on their personal credit.

[This was a libel for repairs by Daniel G. Taylor, administrator, against the steamboat Commonwealth.]

TREAT, District Judge. This is a suit in rem for repairs in the home port, and many of the questions involved are equally novel and important.

The libelant, under the orders of the probate court of St. Louis county, was charged with the duty of administering upon the assets of a copartnership known as the St. Louis Sectional Dock Company—some of the partners having died. Under those orders he was authorized to continue the operations of the docks until they could be sold. Previously the superintendent, Henry Adkins, had been accustomed to make contracts for the company to dock and repair vessels. Upon entering upon the discharge of his official duties, the libelant gave public notice that no contracts for the company would thereafter be recognized or deemed valid unless expressly made or certified by him. The steamboat Commonwealth was owned by a corporation, the stockholders being the masters of the boat, J. S. Snydam, J. N. Bofinger and the copartnership of Stilwell, Powell & Co., which latter copartnership transferred its stock to McCord, a former master. Stilwell, Powell & Co. became bankrupts soon after they transferred their shares of stock. In that condition of affairs, the inspector of the board of underwriters at St. Louis informed the master, Snydam, that

---

[1] [Reversed in Case No. 13,787.]

the boat must be repaired in order to become seaworthy and pass inspection. Thereupon a cursory examination was had to ascertain the probable cost of the needed repairs. Adkins reported that about $6,000 would be sufficient, and that the vessel was not in so bad a condition as the inspector supposed. That fact having been reported to Bofinger, the boat was ordered on libelant's docks, where she was stripped and examined. The result of that examination was a fuller estimate by Adkins, which he reported to Bofinger and Snydam, viz.: that making a liberal estimate the cost of repairs would not probably exceed $13,000, but that Captain Snydam thought that the expense would run up to $14,000. At first Bofinger was inclined to tear up or "wreck" the boat rather than incur so great an expense, but, on consultation with Snydam, consented to the repairs being made, with the understanding on his part that the cost would not exceed the sum stated. The further understanding was, that Snydam should superintend the repairs on the part of the boat, which the inspector would, as usual in such cases, be required to make. The report made to the libelant was that the boat was to be repainted—that $5,000 cash were to be paid as the work progressed—but if the cost of repairs exceeded $15,000, then one-third of said cost should be so paid in cash—the balance in either event to be in good indorsed paper at thirty, sixty and ninety days. When the report was thus made, the libelant assented to the terms and made a memorandum accordingly. Thereupon the inspector directed from time to time what work should be done; and Capt. Snydam sometimes objecting at first, assented finally thereto, and the whole cost of repairs while the boat was on the docks amounted to $21,298.72, of which $4,229.63 were paid, leaving a balance claimed to be due of $17,069.09. When the boat was put off the docks, because more cash had not been paid as requested, about $2,200 additional were needed to complete the repairs.

Upon the foregoing brief summary of facts several important propositions are presented; preliminary to which is the question whether there was a specific contract between libelant and the claimant, that the former should do any prescribed or designated amount of repairs at a fixed sum or within a named time. Upon that point the court holds that the only contract on the part of the libelant, was to dock the boat and make such repairs on her as might be designated from time to time, and on the terms for payment above stated.

First. As the repairs were in the home port, the first point presented is whether a proceeding in rem can be maintained. The new twelfth rule settles that question. It is as follows: "In all suits by material men for supplies or repairs, or other necessaries, the libelant may proceed against the ship and freight in rem, or against the master or owner alone in personam." Grave questions are raised as to the true interpretation of that rule in the light of the many adjudications had with respect to supplies in the home and foreign ports, and in cases where the owners are present or absent. It would require a more elaborate discussion than can now be given, if this court should undertake to analyze, historically or otherwise, the shifting views on those points which have prevailed from time to time, and to comment upon them with due regard to elemental principles. The last utterance of the United States supreme court indicates that, in accordance with the opinions generally expressed by bench and bar, for many years, it will hold as was done by this court last term, and was strongly instructed by the United States circuit court here in 1857 (Hill v. Golden Gate [Case No. 6,491]), that the existence or non-existence of a maritime lien is wholly independent of the fact that the vessel was repaired in the home instead of a foreign port. The primary maxim is that, as a vessel is made to plow the seas instead of lying by the wall, whoever furnishes the necessary means for prosecuting her voyage will have therefore a maritime lien upon or tacit hypothecation of the vessel, unless the master had adequate funds in the foreign port, or the owners in such port, or in the home port, had ample credit. As this court ruled at the last term, so it now holds; that the question as to maritime lien does not depend upon the port where the repairs are made.

Second. In a foreign port the master has authority to order necessary repairs to enable the vessel to pursue her voyage. As held in the cases of The Grapeshot, 9 Wall. [76 U. S.] 129; The Kalorama, 10 Wall. [77 U. S.] 204; the Lulu, Id. 192; The Patapsco, 13 Wall. [80 U. S.] 333; the necessity for credit upon the vessel whence a maritime lien springs, must be presumed, where the master in a foreign port orders repairs which are necessary; the burthen of showing the contrary being thrown upon owner or contestant. That doctrine was repeated by the United States supreme court at its last term, in the case of Merchants' Mut. Ins. Co. v. Baring [20 Wall. (87 U. S.) 159]. That court says: "Contracts for supplies and repairs may be made by the master to enable the vessel to proceed on her voyage, and it appears that they were necessary for the purpose, and that they were made and furnished to a foreign vessel, or to a vessel of the United States, in a port other than a port of the state to which the vessel belongs. The prima facie presumption is that the repairs and supplies were made and furnished on the credit of the vessel, unless it appears that the master had funds on hand or at his command which he ought to have applied to the accomplishment of those objects, and that the material

men knew the fact, or that such facts and circumstances were known to them as were sufficient to put them upon inquiry and to show that if they had used due diligence in that behalf, they might have ascertained that the master had no authority to contract such repairs and supplies on the credit of the vessel. Whenever the necessity for the repairs and supplies are once made out, it is incumbent on the owners, if they allege that the funds could have been obtained upon their personal credit, to establish that fact by competent proof, and that the material men knew the same or were put upon inquiry, as before explained, unless those matters fully appear in the evidence introduced by the other party." This is the last opinion of the supreme court upon the subject, and in it reference is made to the cases cited above, and also to the case of Thomas v. Osborne, 19 How. [60 U. S.] 22. The necessity for repairs referred to is an apparent necessity — such as a reasonably prudent man, charged with the interests at stake, would make for their safety. It is the good faith of those concerned that the court considers. If the owner be present in the foreign port, it has always been held that the presumption of necessity for relying upon the credit of the vessel is repelled, and that, therefore, the material man must show that the owner had not the needed credit in such foreign port. How rigorously the last rule might now be applied, is not important to discuss. The master's authority in a foreign port in the absence of the owner was always held to be greater than in the presence of the latter.

Third. If their repairs and supplies are furnished in the home port, where the owner resides, it may be safely asserted that the master has no authority unless express —that is, unless he is duly authorized by the owners to order the same. Abroad, the master orders reasonably necessary repairs to enable the vessel to prosecute the undertaking voyage; for his authority to act springs from the necessity of the case in the absence of the owner. At home the owner may order more than temporary repairs—whatever he deems proper—not for one voyage, but for the permanent and thorough overhauling of the vessel. The authority of the owner is not limited as that of the master; he may, in the home port, give his own orders in that respect, or entrust the master with full power to act. There is, then, no cargo at risk—no pending voyage. The owner's power over the vessel is not then confined to merely what is essential to the success of a pending voyage. Hence, in passing upon the necessity of repairs, ordered or authorized by an owner under such circumstances, a more liberal rule should prevail. He is supposed to understand the necessity and policy of the repairs he orders to be made.

In the case under consideration, the own-

ers of a large majority of interest in the boat, including the president, were not only present here in the home port, but authorized the master, who was also a large owner, to superintend the repairs. It seems to have been conceded that what the inspector ordered as necessary was to be done. The master and all others acted upon that hypothesis. The reason is manifest: for a boat upon which no insurance could be had could procure no shipments, and would therefore be effectively tied up to the wall. The necessity of repairs, then, in this, the home port, is, so far as the material man in this case is concerned, determined by the orders given by the inspector and acquiesced in by the master. Hence there was, in the meaning of the maritime rule, a necessity for the repairs.

Fourth. Was there a necessity for relying upon the credit of the vessel? The reason for insisting upon this necessity, as well as the necessity for repairs, has reference to the many interests which are constantly springing up, creating maritime liens or tacit hypothecations other than the owner's interests may be involved, consequently, if he can, independent of the rights of others, fasten these secret liens upon the vessel, those who, under these rules of necessity, furnish repairs and supplies, may find themselves without supposed and adequate security. Still, that danger is less in the home than in a foreign port, for in the former the voyage is at an end, while in the latter the voyage is in progress and its future incidents cannot be predicted. On the arrival of the vessel at her home port all who have demands against her can enforce them at once. If they choose to lie by while she is undergoing repairs to fit her for new voyages, they have no just ground for complaint, certainly not if the vessel, before her departure, is seized and sold to answer the demands against her. The new repairs are to be considered as giving enhanced value, and thus increasing the proceeds received from the sale. Why, then, should the last material man be deprived of the fruits of his advances, or his additions to the vessel's value be appropriated to the payment of prior and unenforced demands? But it is said that in this case the credit was not given solely to the vessel, and that if it was there was no necessity for so doing. The libelant swears that he would not have done the work solely on the credit of the vessel; and therefore he insisted on part payment in cash as the work progressed, and good indorsed paper for the balance. The boat's paper was finally offered in payment and refused. When, in the course of the work, the proportionate cash payments failed, the libelant, after repeated warnings, put the vessel off the docks so soon as practicable, with due regard to her safety, and ceased further repairs. The promised or understood tender of indorsed

paper was not made and the material man was left unsecured in that way. Has he, because he insisted upon that security from the beginning, been deprived of a lien on the boat? If he had received that security he could not have enforced his demand in rem in any event until that paper matured, or, if negotiable, had been surrendered. It seems that there is some misunderstanding upon this point. The libelant swears that he did not consider the vessel alone adequate security for the value of the work to be done, and therefore he insisted upon security which he never obtained. The conduct of the stockholders illustrates this point. He urged him after his work was done to take the vessel as security for his unpaid balance, and he refused, insisting upon what he claimed was the original agreement. He was thus left to make his demand out of the vessel or her owner. The owner was a corporation with no other property or assets, except this vessel, upon which there were many liens already existing. The statements of witnesses as to her value, independent of the repairs made by libelant, have very little force, for she was subject to seizure and sale to meet the existing liens upon her; and after being repaired at the cost of the owner ($21,000) brought at the marshal's sale less than $19,-000. The result of that sale shows that the libelant was prudent in demanding more than the credit of the vessel for his security. The court can not hold that because he agreed to receive other security, which was never given, he is therefore deprived of all security upon the vessel. The necessity for relying upon other credit than that of the vessel is demonstrated from what has been said as to the ownership. The stock of that corporation was owned by three persons, and, to say the least, it is a grave question whether that fact could have the slightest effect upon the credit of the corporation. If these stockholders did not choose to make themselves individually liable, how could their personal credit give credit to the corporation itself, which had none independent of this vessel—the only property owned by it? The owner—the corporation—had no credit, and as it would give no outside security, the libelant was compelled to fall back on the partial and inadequate credit of the vessel itself.

There has been no attempt in this discussion to dwell upon the fact that the owner was a corporation doing business in this port, and to criticise the mode in which that corporate owner acted through its president and the master of the vessel, who was the principal stockholder. The corporation did act through its president, and with the assent and co-operation of the master—those two persons owning largely more than a majority of the stock. It is apprehended that under such circumstances the rights of a material man can not be defeated on the ground that a mere formal or technical mode of assent or action by the corporation would be proper. Its interests were controlled and managed by its president, and by a majority in interest, and, for all essential purposes, the corporation did assent and act. Whatever may have been the misunderstanding or expectations of the president of the corporation, or of the master expressly entrusted with the superintendence of the repairs, as might be ordered from time to time to be paid therefor, part in cash, as the work progressed, and the balance in good indorsed paper. This is the more probable from the fact that his position was merely fiduciary. Under the orders of the probate court specific duties were imposed on him, requiring especial prudence and circumspection. He was not entrusted with control of funds belonging to the estate to be expended in work, for the payment of which no adequate security was given, but merely to prevent the cessation of business and consequent loss of the estate; he was requested to operate the docks for a time with a view to their advantageous sale. In other words, charged with a special trust, he was not at liberty to act as if he were proprietor of the docks in his own right. Hence, it seems, he insisted upon retaining the sole power to enter upon or make contracts. There was no specific or expressed contract as to the amount of work to be done or the time in which it should be done; the implied contract was that such work should be done as was requested from time to time at reasonable rates and with reasonable promptitude; and on the terms above stated he is entitled to recover accordingly.

This court holds that this marked distinction exists as to maritime liens for repairs and supplies in foreign or home ports respectively, as follows:

1. That while in foreign ports the presumption of a necessity for relying upon the credit of the vessel for repairs arises from the necessity of repairs to enable the vessel to prosecute the voyage; in home ports the presumption of a necessity for relying upon the credit of the vessel does not exist.

2. That in a foreign port the master, as performing the duties of that officer, has authority to bind the vessel and her owners for the necessary expenses of the boat, but in the home port he has not that right.

3. That while in a foreign port the necessary repairs are restricted to such as will enable the vessel to pursue her voyage with safety, the repairs in the home port where they may be ordered by the owners, are not of necessity restricted within such narrow limits.

4. Those who in a home port furnish repairs and supplies must show affirmatively, in order to have a lien on the vessel, that it was necessary to rely on the credit of the vessel; or, in other words, that the credit of the owners was not such as would justify a

prudent man in furnishing the repairs and supplies solely on their personal credit. Many persons in the home ports have been accustomed, in consequence of the state boat acts, to suppose that repairs and supplies furnished there at the instance of the master, gave a lien irrespective of all other considerations, but as they, so far as they trespass upon admiralty jurisdiction, are void, it is important that material men in home ports, bear in mind the distinction above stated, and the elements out of which a lien in a home port springs.

If the owners are in good credit, there is no necessity for relying on the credit of the vessel, and, consequently, no lien is created.

In the case on hearing it appears that the corporation had no credit within the meaning of the rule, and therefore the libelant had a right to rely upon the credit of the vessel. His demand must be allowed so far as proved, and classed as a maritime lien. The amount found to be due is $17,054.19. The stress has been laid upon the fact that the boat was still in the possession of the libelant when the libel was filed and the warrant in rem. As to whether that strengthens his demand it is not necessary to discuss.

It may be a serious and embarrassing question whether the ordinary rules governing corporations and stockholders are to be rigidly recognized in admiralty. If three or more owners of a vessel can become a corporation and transfer said vessel to the corporation, each owner taking an equivalent proportion of stock for his interest in the boat, and only the corporation as such and its corporate assets, viz., the vessel, be liable for maritime contracts and maritime torts, of what practical force is the liability of the owners in personam as well as of the vessel in rem? It is a well-settled rule that supplies furnished by a part owner do not give a maritime lien; but if he, in the manner stated, became a technical stockholder instead of a technical owner, is the force of that important rule to be thus abrogated? True, a corporation may own many vessels and be wholly responsible, and governed by the ordinary rules applied to corporations; but on the other hand, as in this case and in others frequently occurring, a few more owners of a vessel become a corporation, thus claiming exemption personally from the duties of ownership. Will the courts of admiralty look at the substance rather than the form—at the actual ownership rather than the formal? If they go behind the acts of incorporation, will they in all cases treat the stockholders as owners, and if not, where shall the line be drawn, or what facts will justify going behind the act of incorporation?

In this case the cross libel is dismissed, $17,054.19 being allowed libelant as maritime lien, and the costs being against the claimant and the interveners.

[On appeal to the circuit court the above decree was reversed. Case No. 13,787.]